**RAILROAD COMMISSION OF TEXAS**
et al., Appellants,

v.

**Roy R. GARDNER, Appellee.**

No. 10798.

Court of Civil Appeals of Texas.

Austin.

July 27, 1960.

Rehearing Denied Oct. 5, 1960.

Will Wilson, Atty. Gen., James N. Ludlum, First Asst. Atty. Gen., Linward Shivers, John Wildenthal, Jr., Asst. Attys. Gen., Black & Stayton, Austin, for appellants.

McKay & Avery, Charlie D. Dye, Austin, for appellee.

HUGHES, Justice.

Roy R. Gardner, appellee, brought this suit as an appeal from the following order of the Railroad Commission of Texas made December 14, 1959, effective January 1, 1960:

"This is to advise that the Commission, at a formal conference held December 14, 1959, considered the application of Christie, Mitchell and Mitchell

to merge the Bruce-Flo (E–3) Field into the Palacios (Frio E Sand) Field, Matagorda County, Texas. The Commission ruled that effective January 1, 1960, the Bruce-Flo (E–3) Field will be merged into the Palacios (Frio E Sand) Field and the existing field rules for the Palacios Field will remain in effect."

Appellee, and others in whose behalf this suit was brought, are the owners and appellee is the operator of the Gardner-Lowe-Beaverson lease of 1,030 acres in Matagorda County, on which is located Beaverson No. 1 gas well, completed December 21, 1958.

This well was originally classified by the Railroad Commission as a new and separate field and was named the Bruce-Flo (Frio E 3) Field, Matagorda County. Under this classification the well was allowed to produce and did produce approximately 4,000,000 cubic feet of gas daily following its connection to a gas pipe line in November, 1959. The daily gross revenue from this well was about $800.

The practical effect of the order of the Commission recited above is to reduce the production of gas from this well to about 600,000 cubic feet per day and the monetary income to about $100 per day.

Christie, Mitchell and Mitchell, a Texas corporation at whose instance the order appealed from was made by the Commission, intervened in this suit and is aligned with the Commission.

A nonjury trial resulted in a judgment decreeing the above order, and all supplementary and incidental orders based thereon, of the Commission to be null and void and enjoining their enforcement.[1]

One of the supplementary orders was the formal order of the Commission entered

December 30, 1959, in which the Commission found that the Bruce-Flo Field and the Palacios Field were "in fact a single common reservoir."

Art. 6008, Secs. 2(c) and 10 (Title 102, Oil and Gas) Vernon's Ann.Civ.St., provide:

"(c) The term 'Common Reservoir' as used in this Article shall mean any oil and/or gas field or part thereof which comprises and includes any area which is underlaid, or which from geological or other scientific data or experiments or from drilling operations or other evidence appears to be underlaid by a common pool or accumulation of oil and/or gas;"

"Sec. 10. It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir in the manner and method herein set forth. The Commission shall prorate and regulate such production for the protection of public and private interests:

"(a) In the prevention of waste as 'waste' is defined herein;

"(b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article."

The first three points of appellants are to the effect that the order of the Commission is supported by substantial evidence and that the Trial Court erred in not so holding.

■ It is our opinion that there is substantial evidence reasonably supporting the order of the Commission, the most forceful and persuasive evidence being that relating to the variation shown in the bottomhole pressure of appellee's well when it was in

---

1. For other phases of this litigation see our opinion in Railroad Commission of Texas v. Roberts, 332 S.W.2d 745, Mandamus denied by Supreme Court March 30, 1960, also Gardner v. Railroad Commission, Tex., 333 S.W.2d 585.

a shut-in or semishut-in state. Tests reflecting these variations were taken by appellee, or under his direction and control. The results of these tests are shown below:

| "Date | Depth of Bomb in | Bomb Pressure in Pounds Per Square Inch | Depth to Which Pressure Calculated in Feet |
|---|---|---|---|
| 12–22–58 | 8400 | 4228 | 9020 |
| 1–27–59 | 8400 | 4225 | 9020 |
| 8–24–59 | 9000 | 4200 | 9020 |
| 9–13–59 | 9000 | 4192 | 9020 |
| 10– 9–59 | 9000 | 4161 | 9020 |
| 11– 3–59 | 9008 | 4148 | 9008' |

Production from the Beaverson (appellee's) well began November 11, 1959. Production from the wells to the south (Palacios Field) began in June 1959.

It is apparent that the first two tests shown on the above schedule should reflect virgin bottomhole pressure since they were conducted under similar conditions and prior to any gas production in the area. The difference of three pounds in the two tests was regarded by appellee's expert witness as being within the normal limitations of accuracy of the test and even closer than he would expect.

The third and forth tests (those of 8–24–59 and 9–13–59) were made at a time when appellee's well had produced no gas, but the wells to the south had been in production since June 1959.

When the fifth and sixth tests were taken (10–9–59 and 11–3–59) appellee's well had produced not to exceed ten million cubic feet of gas which escaped while the well was being reworked, and the wells to the south had been in constant commercial production since June 1959.

The constant drop in the bottomhole pressure of appellee's well while it was shut-in or in a semishut-in state defies explanation except upon the premise of inaccuracy of the tests or the escape of gas from the reservoir in which the well was located.

The only possible manner in which this gas could have escaped from such reservoir, except the amount lost from appellee's well, was through production from other wells in the same reservoir. Under this record, such wells can only be identified as wells which are located to the south in the Palacios Field.

The drop in bottomhole pressure of appellee's well as shown above was 80 pounds. Mr. Orville K. Haynie, a petroleum engineer, testifying for appellants, stated that the loss of gas from this well while it was being worked over could not explain the 80 pound drop in bottomhole pressure. He further testified that "The only way we can explain the 80 pound pressure drop in that well is reflected from the production in the Christie, Mitchell and Mitchell wells and the other field wells. * * *"

Mr. Park J. Jones, a petroleum engineer and witness for appellants, testified that it would require a production of 624 million cubic feet of gas to cause a drop of pressure of 80 pounds in a reservoir containing 39 billion cubic feet of gas, the amount appellee estimated to be in the reservoir in which his well was located.

There is also evidence that a calculated pressure test (without the use of a bottomhole pressure bomb) made December 26, 1959, showed a bottomhole pressure of 4,182 pounds per square inch. This was a drop of 46 pounds from the original pres-

sure of 4,228. This test was after 46 days of production from the well.

Mr. Jones testified that these calculated pressures were not accurate and that it was "common" to be off as much as 100 pounds in calculating pressures at the depth of appellee's well. He stated that expensive bomb pressure tests would not be used if calculated pressures were accurate.

Conceding, however, the 4,182 figure to be correct, the evidence is that, assuming appellee's well was producing at full legal capacity, such well would have produced about 200 million cubic feet of gas. Mr. Jones testified that a 46 pound drop in bottomhole pressure would have indicated a production of 360 million cubic feet of gas from the reservoir. This would leave 160 million cubic feet unaccounted for unless it was due to production from other wells in the Palacios Field.

Appellee criticizes the accuracy of the bottomhole pressure revealed by the bomb method. These criticisms we will now notice.

(1) Range of error. This range of error was shown to be 3% plus or minus.

Appellee applies this range of error both ways to his benefit, and for the purpose of reducing the loss in bottomhole pressure. In other words he reduces the original pressure by subtracting the 3% maximum error of the bomb (12 pounds) but in considering the lower presure of 4,192 pounds shown on 9–13–59, he increases it by the maximum bomb error (12 pounds). By this method the loss in bottomhole pressure is reduced 24 pounds.

In our opinion this method of finding fault with the bomb pressure tests is not warranted by the record and is unreasonable.

(2) We quote appellee:

"The BHP bombs are subject to calibration errors. For this reason, 'dead weight testers' are used. They reflect the true surface pressure. As said by Cooke, 'they are the best means that you have of checking the performance and operation of your bottom hole pressure gauge. * * * Yes, Sir, the bomb'."

It is correct that "dead weight testers" are used to check the perfomance of the bomb.

Mr. Milton M. Cooke, the person who made the pressure bomb tests for appellee, testified "We rely on the bomb." Contrary to the statement of appellee that the "dead weight testers reflect the true surface pressure," Mr. Cooke testified:

"Q. I say, your dead-weight tester is the true, accurate pressure at the surface, isn't it? A. Not necessarily true and accurate. It has certain limitations.

"Q. Don't you calibrate the bomb with these dead-weight testers? A. No, sir.

"Q. How do you calibrate them? A. We calibrate these bombs with a dead-weight tester in the laboratory. This is a portable dead-weight tester we use in the field."

The significance of the reliability of the "dead weight testers" is that appellee in attempting to account for the loss in bottomhole pressure of his well as shown by the bomb pressure tests takes, for example, the surface pressure shown by the bomb on December 22, 1958, to be 3,385 pounds and corrects it to the surface pressure of 3,376 pounds shown by the dead weight tester, and subtracts this difference of 9 pounds from the pressure of 4,228 reflected by the pressure bomb.

This method of correcting the pressure bomb results is not supported by any witness, and we do not consider it as discrediting the pressure bomb tests.

(3) In the first two pressure bomb tests the bomb was set at 8,400' and calculations.

made from there to the bottom of the hole. Appellee contends that this is evidence of inaccuracy of the test.

The evidence is that the calculations for the test below the bomb depth were based on the assumption that the substance encountered in the hole below 8,400′ was gas. The result of this assumption is that less bottomhole pressure is shown than if the substance below this depth was water or oil.

Mr. J. C. Walter, Jr., a consulting geologist and petroleum engineer and a witness for appellee, testified:

"Q. All right, sir. And don't you know, based upon your training and experience in looking at that report, that the man that made the report, the Company that made the report, used the gas gradient from 8400 to the depth at which the pressure is reflected 4228 pounds? Don't you know that by looking at it? A. Yes, sir. After seeing here what gradient is used down to 8400 feet, I can say that, yes.

"Q. All right, sir. A. He has used that same gradient.

"Q. Now, if a gradient for some heavier material, such as water, had been used, the pressure would actually be shown higher than that, would it not? A. Yes, sir, it would.

"Q. All right. So, if there is any error in that calculation from 8400 to the perforations, if there is any error in the use of the gradient, the error would result, if you corrected the error, you would get actually a higher pressure than the 4228, if there were water in there, for instance, instead of gas? A. On this calculation, it would be higher if there were water, yes, sir."

Mr. Milton Cooke, the expert selected by appellee to take the tests, testified:

"Q. And in the very first instance where you show the pressure of 4228 pounds, you took for your gradient gas, the lightest fluid of all, which would give you the lowest possible pressure on your calculation down; is that right? A. Yes, sir.

"Q. In other words, if you had used any other gradient, the difference between your first pressure, of 4228 pounds, and those subsequent pressures would be greater than it is actually shown on this blackboard; is that right? A. Yes, sir."

If there was any error made in this respect, it was favorable to appellee.

(4) The criticism here is that tests made while a well is flowing are inaccurate. This has reference to the 10–9–59 test.

When this test was made the "E–3" sand, the sand in which appellee's well was completed, had been cemented off, the well had been perforated opposite the "D" (8,550′) sand, and that sand was open into the well bore. The cementing of the "D–3" sand was faulty with the result that gas from this sand escaped into the capped well bore and hence built the pressure in the well bore to the pressure of the "E–3" sand, the evidence showing that none of this escaping gas passed into the "D" sand.

Mr. Haynie, after testifying at length about this matter, concluded:

"Q. All right, sir. Then I will ask you if, in your opinion as an engineer, you can account for the 80-pound drop in pressure of the Beaverson No. 1 well upon any faulty cement job allowing gas to come into the hole during the period October 1 to October 12, 1959? A. No, sir. The only thing that I can attribute that 80-pound loss to is to the production from the whole reservoir.

"Q. All right, sir."

No witness testified that the October 9th test was inaccurate because the well was then flowing. We find substantial evidence

reasonably supporting the accuracy of this test.

(5) The point here is that since the well had been worked over, a period of time for it to clean itself by production of gas was required in order for pressure tests to be accurate. This criticism is levelled at the November 3rd test.

This test was made in new perforations opposite the "E–3" sand at 9,008 feet, immediately upon completion of the rework job in which there, presumably, was injected into the well fluids, mud, gelling compounds and other fluids.

It is conceivable, to us, that these conditions could affect the accuracy of the November test, but since no witness testified to this we cannot undertake the expression of opinions or conclusions in this highly technical field.

It is our opinion that the criticism appellee makes of the bottomhole pressure tests of his well are not sustained and are not sufficiently grounded for us to substitute our judgment on them for the weight obviously accorded them by the Railroad Commission.

There is a mass of geological evidence pertaining to subsurface structures and conditions from qualified witnesses for both sides which, if standing alone, would constitute substantial evidence reasonably supporting a finding by the Commission favorable to either side of this controversy.

We need not discuss this evidence because it is, except as noted below, purely opinion evidence which does not establish any material fact as a matter of law. Board of Firemen's Relief and Retirement Fund, etc. v. Marks, 150 Tex. 433, 242 S.W.2d 181.

The excepted evidence relates to what appellee denominates "Fluid contacts and Reverse Gravitational Sequences." This theory of separate reservoirs in the area is based on undisputed facts and the application of immutable laws of physics which are of a conclusive nature. We quote from the brief of appellee:

"Keeping in mind the fact that the Commission has declared that all members of the Frio E sand constitute a single, continuous reservoir, and that it has now declared the Bruce-Flo Field, with the Beaverson well to be a part of that so-called 'single common reservoir', the following facts were brought out by witness Walter, which conclusively show fluid differences which occur in comparing fluids in the Beaverson well with fluids in certain of the Palacios Field wells. These are defined by Walter as 'reverse gravitational sequences' in that, considering the fact that water is heavier than oil, and oil is heavier than gas, they should be found, if a common reservoir exists, well compared to well, in common order; viz., gas above oil and oil above water, and both oil and water below gas.

"To find these fluids otherwise is to find a condition contrary to the Law of Gravity, and such condition is explainable only by the existence of sealing faults. And when it is assumed that the Frio E is a 'single continuous reservoir', you would not find the heavier fluids, such as water, above gas, nor water above oil, this being a simple application of the Law of Gravity. The witness Walter said that if our field is in communication with that field, and it is a part of a single continuous reservoir, you would not find the heavier fluids above gas when comparing the Bruce-Flo Field with the Palacios Field.

"These conditions were found to exist:

"(1) Water in the E–2 sand in the Gardner-Lowe Beaverson well was found 34 feet above oil in the Kilroy & Callery # 2 Pierce in the E–1.

"(2) Water was found in the E-1 sand in the Magnolia City of Palacious #2 110 feet above the gas completion in the Gardner-Lowe Beaverson E-3.

"(3) Water in the E-2 in the Gardner-Lowe Beaverson was 15 feet above gas in the Christie No. 1 Carlson in the E-3.

"(4) Water in the E-2 in the Gardner-Lowe Beaverson was found by formation test 93 feet above an E-3 gas completion in the Brazos No. 1 Harrison.

"Such conditions could not exist if these fields were in communication. For, as appellants' witness Jones said, of the fact that, in the 4th example above, to have water in the Beaverson 93 feet above gas in the Harrison means that 'they are not in the same reservoir,' and of water above gas, he answered the question 'You don't have that situation where you have a common reservoir, do you?', by saying: 'Water on top of gas, no'."

As to these matters the Trial Court found:

"(d) With reference to the order merging the Bruce-Flo field with the Palacios Field, dated December 30, that these fields 'are in fact a single common reservoir', the Court finds that this declaration is contrary to the facts, not merely when tested by all available geological data in the area, but is contrary to the facts when tested by the principles of the law of gravity. Plf. Ex. 15 tabulates the 'E' zone fluid contents by wells, arranged by their subsea depths. The evidence shows, and the Court finds, that the Gardner Beaverson, produces gas from a lower level, subsea, in the E zone, than all other gas wells in the Palacios Field, with but two exceptions, the Magnolia

City of Palacios No. 1 and the Brazos No. 1 Harrison. There are eleven (11) wells in the Palacios Field which contain either water or oil at higher subsea levels in the Frio E zone than that at which gas is found in the Beaverson, J. Carlson No. 1 data excepted because of diesel oil invasion heretofore mentioned. Such condition would not, by virtue of the law of gravity, exist if these wells were in a common reservoir. And when the condition does exist, as here shown, the law of gravity requires and forces the conclusion that there is no common reservoir, and that separation must exist, either vertically, or horizontally, or both. Furthermore, the only two wells in the field producing gas at a greater subsea depth than the Beaverson are the Magnolia City of Palacios No. 1 and the Brazos No. 1 Harrison, and in these cases, the Court finds that water exists in the Frio E zone in the Beaverson above gas in both the Magnolia and Brazos wells."

The expert evidence from all parties is to the effect that the Frio E zone is divided into three separate sands, E-1, E-2, and E-3, appellee's well producing from the E-3 sand.[2]

It is to be noted that the Trial Court did not expressly find that horizontal and vertical separation of the three "E" sands was established, but only that separation "either vertically, or horizontally, or both" must exist.

Evidence that the "E-3" sand contains gas at a depth below that at which the "E-1" sand contains water proves vertical separation of these sands by impervious material. As to this Mr. Walter, for appellee, testified:

"Q. I see. All right. Now, then, are these various 'E' Sands separated vertically in the area? A. Yes, sir,

2. The order of the Commission's finding that these three sands constitute a common reservoir is not before us.

you can see from your electric log between these sands there are sections or intervals of sandy shale separating the individual members. In addition, in this particular well there is one case in point. In this well we tested salt water in the E–1 Sand here; yet this well is completed in the E–3 Sand below that depth; therefore, these individual members would have to be separated vertically.

"Q. Do you mean by virtue of the operation of the Law of Gravity? A. That is correct, the water being heavier above gas, could not exist in a common, continuous reservoir."

Mr. De Guire, for appellants, testified that his opinion that the "E" sands were separate reservoirs was based on the fluid contacts, and that he had no basis for "putting a fault between the Beaverson well (appellee's) and the wells to the south," essential to horizontal separation.

It is conceded by appellants that evidence as to the same sand member containing gas at a depth below that at which water is found in another well is proof of horizontal separation of the sand by sealing fault or otherwise.

Appellants also concede and we quote:

"Appellee did prove a few instances of reverse gravitational sequence as between the same sand member as found in a few widely separated wells.[3] His witness referred to the alleged fact that Tidewater No. 2 Slaughter drill stem tested water in the 'E–2' sand 37 feet above the depth at which Kilroy No. 1 Hogg was completed as a gas well in the 'E–2;' that Tidewater No. 1 Nelson allegedly drill stem tested water in the 'E–2' 92 feet above the point at which Kilroy No. 1 Hogg was completed as a gasser in the 'E–2,' and 133 feet higher than the interval at which Christie No. 1 Ressler allegedly drill stem tested gas in the 'E–2' sand; and that Atlantic's No. 1 City of Palacios allegedly drill stem tested water in the 'E–3' sand 183 feet above the depth at which Christie's No. 1 Carlson was completed as a gas well in the 'E–3' sand.

"It may well be that the foregoing evidence proves that these widely spaced wells are separated by sealing faults or in some other manner. It would seem that such evidence may reflect the A fault which all parties recognize to have the greatest throw of any fault in the area and which may be sealing or partially sealing."

Appellants then argue that the question as to whether all wells are properly classified as wells in the Palacios Field is not relevant, saying: "It is useless to debate this question, since, as already shown, appellee has never requested the Commission to consider the issue of whether certain wells in the field are separated by the A fault and the Commission has never called any hearing to consider such issue. Whether all these wells should be classified as wells in the Palacios gas field is of no more relevance here than the issue of whether the various 'E' sand members constitute one reservoir known as the Frio 'E' sand or several reservoirs known as the Frio 'E–1' sand, the Frio 'E–2' sand, etc. The important fact here is that there is no such evidence even allegedly showing separation as between the Beaverson well and wells to the south."

We believe that, under this record, it has been scientifically established that (a) appellee's well produces from a reservoir from which other wells in the area also produce (b) all other wells in the area do not produce from this same reservoir.

■ It is manifestly unjust for appellee's well to produce gas upon the false premise

---

3. These wells are separated from each other by some 6,000′ to 9,000′, and are at varying distances from the Beaverson, the nearest being about 4,000′.

that it is the only well which produces from the reservoir tapped by it. It is also manifestly unjust that appellee should share its proration and production rights, based on production from a common reservoir, with those wells which do not produce from the same reservoir.

We believe the proper solution to this problem is the one suggested by the Commission, and which we accept at face value. We quote from the brief of the Commission:

"We want to make it clear that appellee is not without recourse if he can convince the Commission or the courts either that several wells classified by the Commission as wells producing from the Frio 'E' sand of the Palacios gas field are in fact not producing from that reservoir or if he can convince the Commission or the courts that the Frio 'E' sand constitutes several reservoirs instead of one reservoir. Upon his request the Commission will call a hearing to consider one or both of these issues."

It is not proper, in this proceeding, for a judgment to be based on matters established by proof, even conclusively established, as to which the jurisdiction of the Commission was not invoked. The only order of the Commission which appellee directly attacked was the order combining his well with and subjecting it to the rules of the Palacios Field.

Appellee points to the following alleged inconsistencies in the regulation of this area by the Commission:

(a) In 1957, the Brazos No. 3 Harrison Well, an oil well, was treated as a separate reservoir from the gas wells of Christie, Mitchell and Mitchell by the Commission acting on geology supplied by Christie, Mitchell and Mitchell.

When this oil well became a gas well, and after Christie, Mitchell and Mitchell acquired it, it was, by the Commission, placed in the Palacios gas field.

(b) When the Commission had before it the matter of the oil wells to the east, (Christie having attended a conference with the oil operators prior to the hearing), the Commission entered its order finding multiple reservoirs with separation from the Christie et al. gas wells.

Appellee has this to say regarding these matters:

"We most certainly do not attack what the Commission did in the area of the oil wells, nor do we attack what the Commission did for Christie earlier, in recognizing fault separation as to the Brazos No. 1 Harrison. Quite to the contrary, we acknowledge both of said acts to have been quite proper and correct, factually, when tested by the recognized characteristics and geological standards of the area. What we do object to is the Commission's recognition of such conditions in behalf of one operator or one group of operators, and a contemporaneous arbitrary refusal to recognize the same conditions for this appellee."

█ Whatever complaint appellee may have in this regard, it is our opinion that such actions are not reviewable here. The consistency vel non of the Commission is not a subject of judicial inquiry. The fact, if it is a fact, that the Commission may have erred at other times and in other matters is not our present concern. We do not sit in judgment on the general conduct of the Commission.

The Commission makes the following statement, with which we agree:

"It is conceivable that the Commission may have been wrong in classifying the oil area as several separate oil reservoirs. It is within the realm of possibility that the Commission may have erred in classifying several gas wells as wells producing in the Palacios gas field. Conceivably the Commission originally should not have classified Brazos No. 1 Harrison as an

oil well producing from a reservoir separate and distinct from the Palacios gas field. We are not suggesting or admitting that in any instance the Commission did so err. The point we make is that the issue presented is not whether the Commission has been consistent. The question presented is whether the finding of the Commission that the Beaverson well is producing gas from a reservoir from which wells in the Palacios gas field are also producing gas is supported by substantial evidence."

Appellee states that "It is a jurisdictional prerequisite * * * that a common reservoir exist" before the Commission was authorized to enter the order merging the two gas fields, and "that the substantial evidence rule has no application in jurisdictional matters."

We need not discuss this legal pronouncement because, while we have held the order of the Commission to be reasonably supported by substantial evidence, we have also held that such order was supported by evidence of a scientific and conclusive nature. Such evidence meets any test which may be applied to it.

Appellee has a counterpoint to the effect that the order in question does not contain findings as required by law.

By supplementary order dated December 30, 1959, the Commission found that the Bruce-Flo (Frio E–3) and Palacios (Frio "E" sand) fields " * * * though developed separately, are producing from a common reservoir * * *"

It is our opinion that this finding was the only essential finding to the entry of the merger order. It was contained in the supplementary order. Whether the order would be valid without such finding, we need not decide.

■ Appellee also has a counterpoint to the effect that appellants are bound by the findings of fact of the Trial Court since they have failed to attack such findings. We disagree. Appellants have assigned several errors to the error of the Trial Court in failing to find that the action of the Commission was supported by substantial evidence. These assignments are, in our opinion, sufficient to challenge all and singly, the findings of fact of the Trial Court, a statement of facts being before us.

We are convinced that appellee is not entitled to the relief here sought by him. We, accordingly, reverse the judgment of the Trial Court and render judgment that appellee take nothing by his suit, all without prejudice to such relief as appellee may prove himself entitled to at the hands of the Commission as herein indicated.

Reversed and rendered.

